# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|                              |     |                          |
|------------------------------|-----|--------------------------|
| **JOHN LAWRENCE DUBOIS,**    | )   |                          |
|                              | )   |                          |
| **Petitioner,**              | )   |                          |
|                              | )   |                          |
| **v.**                       | )   | **Case No. CIV-13-721-R**|
|                              | )   |                          |
| **TRACY MCCOLLUM, Warden,**  | )   |                          |
|                              | )   |                          |
| **Respondent.**              | )   |                          |

## REPORT AND RECOMMENDATION

Petitioner John Lawrence DuBois, a state prisoner appearing pro se, has filed a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus and Brief in Support, challenging the constitutionality of his state-court criminal conviction. *See* Doc. Nos. 1, 3. Respondent Warden Tracy McCollum has filed a Response to Petition for Writ of Habeas Corpus (Doc. No. 14), to which Petitioner has replied (Doc. No. 17). Petitioner also has filed a Motion for Discovery and a Motion for Evidentiary Hearing (Doc. Nos. 5, 6). United States District Judge David L. Russell has referred this action to the undersigned magistrate judge for initial proceedings in accordance with 28 U.S.C. § 636. As outlined herein, the undersigned recommends that the Petition and the pending motions be denied.

## I.     Relevant Case History and Issues Presented

On November 27, 2009, Petitioner was stopped by two Oklahoma Highway Patrol troopers while driving a Ford Focus belonging to passenger Jennifer Kincaid on a public

road.[1]  Trial Tr. 23-24, 27-28, 47 (*State v. DuBois*, No. CF-2009-303A (Stephens Cnty., Okla. Dist. Ct. Aug. 16-17, 2010)) (Doc. No. 16).  The troopers searched the car, finding what they deemed a "mobile meth lab," and ultimately arrested Petitioner and Ms. Kincaid on charges stemming therefrom.  Trial Tr. 29-30, 35, 55-56, 71-88; Original Record ("OR") at 1-6 (Doc. No. 16).  On August 17, 2010, after a jury trial in an Oklahoma state district court, Petitioner was convicted of Endeavoring to Manufacture Methamphetamine, after two or more prior felony convictions, in violation of Title 63, Section 2-408 of the Oklahoma Statutes.  Trial Tr. 14, 166; OR 1-2, 5-6, 67, 73-74.  In accordance with the jury's recommendation, Petitioner was sentenced to eighty-five years' imprisonment.  Trial Tr. 188-89; Sent'g Tr. 208 (Oct. 7, 2010) (Doc. No. 16); OR 60, 73.

Petitioner appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals ("OCCA").  OR 88.  The OCCA affirmed Petitioner's conviction and sentence on October 21, 2011.  OCCA Direct Appeal Op., No. F-2010-1021 (Doc. No. 14-3).  Next, on July 13, 2012, Petitioner filed an application for postconviction relief in the trial court, which was denied on October 30, 2012.[2]  Petitioner appealed to the

---

[1] To distinguish the Ford Focus from the highway patrol vehicle, the undersigned will refer at times to the Ford Focus as "Petitioner's vehicle," although the record reflects that the car was owned by Ms. Kincaid.  Trial Tr. 27-28; Resp. Ex. 6, Doc. No. 14-6, at 6-7. Court filings indicate that Ms. Kincaid was Petitioner's wife, but that relationship is not clearly indicated in the trial testimony.

[2] The docket sheet from *State v. DuBois*, No. CF-2009-303A, District Court of Stephens County, State of Oklahoma, is publicly available through www.oscn.net.

OCCA; that court affirmed the denial of postconviction relief on March 12, 2013. OCCA Postconviction Order, No. PC-2012-1052 (Doc. No. 14-5).

Petitioner then filed this federal habeas action raising eleven grounds for relief: (1) the evidence presented at trial was insufficient to support Petitioner's conviction; (2) the trial court erred in failing to instruct the jury as to lesser-included offenses supported by the record; (3) the admission of illegally obtained evidence at trial violated Petitioner's Fourth Amendment rights; (4) "prosecutorial misconduct" in the form of a *Brady*[3] violation deprived Petitioner of due process; (5) Petitioner's trial counsel was constitutionally ineffective for failing to investigate and discover footage from the video camera that was mounted to the dashboard of the vehicle of the Oklahoma Highway Patrol troopers who stopped and searched Petitioner's vehicle (the "dash-cam video"); (6) Petitioner's trial counsel was constitutionally ineffective for failing to seek suppression of evidence obtained from Petitioner's vehicle; (7) Petitioner's trial counsel was constitutionally ineffective for failing to challenge the use of a prior conviction to enhance Petitioner's sentence; (8) Petitioner's appellate counsel was constitutionally ineffective for failing to raise on appeal the alleged *Brady* violation; (9) Petitioner's appellate counsel was constitutionally ineffective for failing to raise on appeal trial counsel's failure to seek suppression of evidence obtained from Petitioner's vehicle; (10) Petitioner's appellate counsel was constitutionally ineffective for failing to raise on appeal trial counsel's failure to object to the use of a prior conviction to enhance Petitioner's sentence; and (11) Petitioner's appellate counsel was constitutionally

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

ineffective for failing to raise on appeal, and seek an evidentiary hearing regarding, trial counsel's failure to investigate and obtain the dash-cam video. *See* Pet. at 5-19.[4] Respondent concedes that Petitioner's claims are timely and that Petitioner exhausted his state-court remedies with respect to the grounds raised in his Petition. *See* Resp. at 2.

## II.     The Standard of Review

The Tenth Circuit recently laid out the standard of review for evaluating state-court legal determinations that have been challenged in federal court through a 28 U.S.C. § 2254 habeas proceeding:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we must apply a highly deferential standard in § 2254 proceedings, one that demands that state-court decisions be given the benefit of the doubt. If a claim has been "adjudicated on the merits in State court proceedings," we may not grant relief under § 2254 unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), refers to the holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision.

> Under the "contrary to" clause of § 2254(d)(1), we may grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts. And under the "unreasonable application" clause, we may grant relief only if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. An unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its

---

[4] References to the Petition use the ECF pagination.

> independent judgment that the relevant state-court decision applied clearly
> established federal law erroneously or incorrectly.

*Dodd v. Trammell*, No. 11-6225, __ F.3d __, 2013 WL 7753714, at *6 (10th Cir. Oct. 16, 2013) (alterations, citations, and internal quotation marks omitted).

## III.     Analysis

### A. Ground 1: Sufficiency of the Evidence

Petitioner claims in Ground 1 that the evidence admitted at his trial was insufficient for a jury to have found, beyond a reasonable doubt, that he committed the crime of Endeavoring to Manufacture Methamphetamine. Pet. at 5; Pet'r Br. at 23-24. In reviewing a habeas challenge based on the sufficiency of the evidence, a federal court "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). For habeas review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The reviewing court considers both direct and circumstantial evidence in determining whether evidence is sufficient to support a conviction. *Lucero v. Kerby*, 133 F.3d 1299, 1312 (10th Cir. 1998). In this habeas matter, the Court "may not weigh conflicting evidence []or consider the credibility of witnesses" but must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *See id.* (internal quotation marks omitted).

Here, the sufficiency of the evidence inquiry is based on the substantive elements of the crime as defined by Oklahoma law. *See Jackson*, 443 U.S. at 309, 324 n.16. In Oklahoma and as relevant to this case, the elements of Endeavoring to Manufacture Methamphetamine are: (1) knowingly; (2) endeavoring; (3) to manufacture; (4) the controlled dangerous substance of Methamphetamine. Okla. Unif. Crim. Jury Instruction No. 6-3B (2d ed.); Okla. Stat. tit. 63, §§ 2-401(G)(1), 2-408; *see also* OR 49 (Jury Instruction No. 6). Petitioner specifically contends that the evidence does not support the first element—i.e., that he "knowingly" endeavored to manufacture methamphetamine. Pet. at 2, 5. According to Petitioner, the prosecution (or "the State") did not establish this element because, although Petitioner was driving the Ford Focus, the car belonged to Ms. Kincaid, the mobile meth lab components were "secreted away" in the car and its trunk, and the State's evidence only showed Petitioner's proximity to, rather than knowledge of, these components and their intended use. Pet. at 5; Pet'r Br. at 23-24.

At trial, there was detailed testimony and various items of evidence admitted as to the events surrounding Petitioner's arrest and the items retrieved from the car. Trooper Darin Carmen testified that he stopped a red Ford Focus, driven by Petitioner, on November 27, 2009, on eastbound State Highway 7. Trial Tr. 23-25. Trooper Carmen testified that he observed that only one rear brake lamp—the left—on Petitioner's car was working and that the right brake lamp was not clearly visible from the rear. Trial Tr. 23, 41. Lieutenant Roger Peck, who was riding with Trooper Carmen, also observed that the brake lamp on the passenger side was not working. Trial Tr. 23, 47-48. Trooper Carmen drove his vehicle closer to the car, and, as Petitioner began to make a left turn, Trooper

Carmen activated his emergency lights, while observing that the car's windows were down despite "chilly" weather. Trial Tr. 23-24, 26. Petitioner stopped the car on the shoulder of the road. Trial Tr. 24. Trooper Carmen approached the driver's side, and Lieutenant Peck approached from the right rear of the car. Trial Tr. 25. Trooper Carmen noticed a strong odor of ether coming from the car. Trial Tr. 26. He also saw numerous plastic bags and a can of Coleman Fuel in the back seat of the car. Trial Tr. 26-27. When he looked to see if the car was in park, Trooper Carmen observed a metal device in the cup holder of the car between the front seats. Trial Tr. 33-35. He asked Petitioner for his driver's license and proof of insurance. Trial Tr. 27. The passenger, Ms. Kincaid, explained to Trooper Carmen that the Ford Focus was hers but that she did not have proof of insurance with her. Trial Tr. 27, 42.

Trooper Carmen testified that, during this questioning of Petitioner and Ms. Kincaid, Trooper Carmen and Lieutenant Peck exchanged "a look" as a result of the smell of ether emanating from the Ford Focus. Trial Tr. 28. After Trooper Carmen obtained Petitioner's driver's license, the troopers backed off to the area between the two cars. Trial Tr. 28. They confirmed to each other the existence of a smell and that they both believed that Petitioner's car was operating as a mobile methamphetamine lab. Trial Tr. 28, 49. Lieutenant Peck told Trooper Carmen that the metal device he had observed was a "coupler," which Trooper Carmen knew to be used in the purchase or theft of anhydrous ammonia, an ingredient used in the manufacture of methamphetamine. Trial Tr. 35-36, 49. Trooper Carmen testified that this device is used by persons with

methamphetamine labs to connect to an anhydrous ammonia source to transfer the chemical to a container. Trial Tr. 35.

Trooper Carmen asked Petitioner to get in the patrol car. Trial Tr. 28. Ms. Kincaid was asked to get out of the Ford Focus and did so. Trial Tr. 28. Trooper Carmen and Lieutenant Peck testified that Ms. Kincaid consented to a search of the car. Trial Tr. 28-29, 50. The troopers then secured Petitioner and Ms. Kincaid with handcuffs. Trial Tr. 29, 50-51. Lieutenant Peck testified he patted down Petitioner, finding hand tools in his rear pants pocket. Trial Tr. 51, 53-54. Lieutenant Peck also stated he found a laser pointer in Petitioner's front pants pocket, inside of which were baggies of white powder that he believed to be illegal drugs. Trial Tr. 54. In Petitioner's shirt pocket, Lieutenant Peck found a pill bottle containing white powder with red flakes, which he believed to be crushed pseudoephedrine tablets. Trial Tr. 55.

The troopers then proceeded to search the car. Trial Tr. 29, 55. When Trooper Carmen opened a door on the passenger side of the car, he saw a jug containing a two-part liquid in the back seat of the car. Trial Tr. 30. Lieutenant Peck observed Trooper Carmen removing a pitcher with a two-part or two-layer liquid from a bag in the back of the car. Trial Tr. 55-56. Lieutenant Peck identified this liquid as being indicative of a working methamphetamine lab. Trial Tr. 55-56. Trooper Carmen then contacted his headquarters to request his supervisor's assistance. Trial Tr. 30-31.

Trooper Carmen's supervisor, in turn, requested assistance for the "processing" of the lab. Trial Tr. 30-31. This request ultimately was responded to by Stephens County Deputy Sheriff Lawson Guthrie. Trial Tr. 31, 67. Prior to Deputy Guthrie's arrival, the

Ford Focus was moved to an Oklahoma Department of Transportation parking lot approximately two miles from the location of the initial traffic stop. Trial Tr. 42. Trooper Carmen testified that the car was moved because the troopers were concerned that fumes from the car were blowing in the direction of a housing area with small children and elderly persons. Trial Tr. 42.

Deputy Lawson Guthrie testified he had received specialized training in the cleanup of "clandestine" methamphetamine laboratories through the Drug Enforcement Administration ("DEA"), Department of Justice, and Oklahoma Narcotics Enforcers Association. Trial Tr. 67. He testified the mobile lab discovered by Trooper Carmen and Lieutenant Peck used the "Nazi Cook" method of manufacturing methamphetamine. Trial Tr. 69. This method typically requires anhydrous ammonia, lithium from batteries, pseudoephedrine, hoses, soda bottles, muriatic acid, and aluminum foil. Trial Tr. 68-70.

Deputy Guthrie testified that upon arriving at the scene, he searched the car and made an inventory of the items he discovered. These included: jugs of a two-part liquid, a gallon jug of muriatic acid, starting fluid, coffee filters, rock salt, a Dr. Pepper bottle with a hose and rock salt in it, an extension cord, stripped lithium batteries, a butane canister with a torch, metal tanks containing anhydrous ammonia, a coffee grinder, air hose, aluminum foil, an air pump, and pipe fittings. Trial Tr. 72-83, 85-86. Deputy Guthrie also photographed a GPS navigation system on the car's dashboard that displayed where the car was going or had been, including Walmart and Walgreen's. Trial Tr. 83. Deputy Guthrie also found Lowe's and Walmart receipts from November 2009, showing purchases of filters, air lines, water line, an air pump, and Coleman fuel. Trial

Tr. 84-85. Deputy Guthrie testified that the purchased items and other items found in the car commonly are used to produce methamphetamine. Trial Tr. 85, 86. The deputy also found a bottle containing a white powder with red particles that he believed was pseudoephedrine. Trial Tr. 81-82, 86. Photographs of the above items and copies of the receipts were admitted into evidence. Trial Tr. 87-88; State's Exs. 7, 9-21 (Trial Tr. 222-35).

Deputy Guthrie further testified that the white powder in the bottle field-tested presumptively positive for ephedrine and methamphetamine and that one of the metal tanks field-tested positive for anhydrous ammonia. Trial Tr. 88-90. Deputy Guthrie submitted samples of the powders and two-part liquids to the Oklahoma State Bureau of Investigation ("OSBI") for testing. Trial Tr. 91-94; State's Exs. 22-25 (Trial Tr. 236-39).

Criminal investigator Justin Scott testified that he was certified by the Oklahoma Bureau of Narcotics and Dangerous Drugs, as well as the DEA, to investigate, seize, and dismantle clandestine methamphetamine labs. Trial Tr. 108. He further testified that he was trained in and had observed processes used to manufacture methamphetamine. Trial Tr. 108-09. Investigator Scott testified that, based on his review of the photographs of evidence, the items found in Petitioner's car are used to manufacture methamphetamine. Trial Tr. 109-10. The investigator described the process of manufacturing methamphetamine, explaining how items discovered in the car would be used in that process. Trial Tr. 110-15.

OSBI Criminalist Ed Moore testified that he tested various samples submitted by Deputy Guthrie. The two samples of two-layer liquid both tested positive for

methamphetamine. Trial Tr. 124; State's Ex. 26 (Trial Tr. 240). Samples of white powder and pink powder contained in plastic baggies tested positive for methamphetamine and pseudoephedrine, respectively. Trial Tr. 127-30; State's Ex. 27 (Items 2A-2G, 2N-2O) (Trial Tr. 241).

Petitioner first raised his sufficiency-of-the-evidence argument on direct appeal, and the OCCA denied relief on the merits, stating:

> [A]fter reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of Endeavoring to Manufacture Methamphetamine beyond a reasonable doubt. *See Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559; *Self v. State*, 1983 OK CR 8, ¶ 6, 657 P.2d 1202, 1204-1205.

OCCA Direct Appeal Op. at 2.

Because the OCCA applied a standard analogous to that of *Jackson v. Virginia*,[5] this Court's task "is limited by AEDPA to inquiring whether the OCCA's application of *Jackson* was unreasonable" or was contrary to the U.S. Supreme Court's holding in that case. *See Matthews v. Workman*, 577 F.3d 1175, 1183 (10th Cir. 2009); *Turrentine v. Mullin*, 390 F.3d 1181, 1203 (10th Cir. 2004); *Jackson*, 443 U.S. at 319. Under Oklahoma law, the term "knowingly" "imports only a knowledge that the facts exist [that] bring the act or omission within the provisions of [the criminal code]. It does not

---

[5] The OCCA's application of the *Jackson* standard is reflected in its citation to and analysis of Petitioner's sufficiency-of-the-evidence argument under *Easlick*. In *Easlick*, the OCCA adopted the standard for sufficiency-of-the-evidence arguments set forth in *Spuehler v. State*, 709 P.2d 202 (Okla. Crim. App. 1985), which in turn cited and applied *Jackson*. *See Easlick*, 90 P.3d at 559. "That the OCCA did not cite *Jackson* is of no moment; state courts need not refer to, or even be aware of, controlling Supreme Court cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Matthews*, 577 F.3d at 1183 n.2 (internal quotation marks omitted).

require any knowledge of the unlawfulness of such act or omission." Okla. Stat. tit. 21, § 96; *accord* OR 50 (Jury Instruction No. 7). Considering the evidence and testimony outlined above, the jury reasonably could find that Petitioner had knowledge of the relevant factual circumstances and was endeavoring to manufacture methamphetamine through the mobile methamphetamine lab. Therefore, the OCCA's rejection of Petitioner's challenge to the sufficiency of the evidence was not contrary to or an unreasonable application of the governing *Jackson* standard. *See* OCCA Direct Appeal Op. at 2; 28 U.S.C. § 2254(d)(1); *Jackson*, 443 U.S. at 319. Petitioner is not entitled to habeas relief on this claim.

### B. Ground 2: Failure to Give Lesser-Included Offenses Jury Instruction

Petitioner next seeks habeas relief on the basis that the trial court erred by not instructing the jury on certain lesser included/related drug possession offenses allegedly supported by the record. Pet. at 6-7; Pet'r Br. at 25-27. Petitioner's counsel did not request any such instruction(s) at trial. *See* Trial Tr. 143-44.

Petitioner first raised this argument on direct appeal, and the OCCA denied relief on the merits:

> [W]e find the trial court did not abuse its discretion in failing to *sua sponte* instruct the jury on lesser included/lesser related possession offenses. In the face of evidence showing Appellant was the driver of [a] small car containing a working methamphetamine lab, no rational jury would have acquitted him of Endeavoring to Manufacture in order to find him guilty of mere possession offenses.

OCCA Direct Appeal Op. at 2 (citation omitted); *see also Eizember v. State*, 164 P.3d 208, 236 (Okla. Crim. App. 2007) (noting that the relevant inquiry is "whether the

evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser"); *Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) (same).

Petitioner is entitled to habeas relief only if "he is in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2254(a). It follows that Petitioner may not obtain habeas relief on this claim, as there is no federal constitutional entitlement to a lesser-included instruction in a non-capital case.

> The Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases, and neither has this court. Our precedents establish a rule of "automatic non-reviewability" for claims based on a state court's failure, in a non-capital case, to give a lesser included offense instruction.

*Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004) (citation omitted); *accord Tiger v. Workman*, 445 F.3d 1265, 1268 (10th Cir. 2006). The Tenth Circuit additionally has explained that "a petitioner in a non-capital case is not entitled to habeas relief for the failure to give a lesser included offense instruction even if in our view there was sufficient evidence to warrant the giving of an instruction on a lesser included offense." *Lujan v. Tansy*, 2 F.3d 1031, 1036 (10th Cir. 1993) (internal quotation marks omitted).

For these reasons, Petitioner is not entitled to habeas relief on the ground that the trial court erred in failing to give an instruction on lesser included/related offenses.

### C. Grounds 3, 4: Violations of Fourth Amendment and of *Brady v. Maryland*

On his third ground for relief, Petitioner argues that his conviction violates the Fourth Amendment because it stemmed from evidence obtained as the result of an unlawful stop of the Ford Focus by the two state troopers. On his fourth ground for relief, Petitioner contends that the State violated the mandate of *Brady v. Maryland* in

failing to disclose the dash-cam video, which he asserts would have constituted material exculpatory or impeachment evidence.[6] Pet. at 8-10; Pet'r Br. at 2-12; *see also Brady*, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

Petitioner did not raise Grounds 3 and 4 on direct appeal but did include them in his later application for postconviction relief in the state trial court. The trial court denied postconviction relief, finding that these claims statutorily were waived because Petitioner had failed to raise the claims on direct appeal.[7] The OCCA affirmed the denial of postconviction relief, holding that "all issues not raised in the direct appeal, which could have been raised, are waived." OCCA Postconviction Order at 2.

Respondent argues that Petitioner's Grounds 3 and 4 are procedurally barred from review by this Court. *See* Resp. at 28-31. A federal habeas claim may be barred by a petitioner's procedural default in state court "pursuant to an independent and adequate state procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "[T]he [independent and adequate state ground] doctrine applies to bar federal habeas when a

---

[6] Petitioner uses the term "prosecutorial misconduct" in stating his *Brady* claim, but he has not articulated a claim for relief separately based on alleged prosecutorial misconduct. His factual allegations regarding the State's actions at trial are offered in support of and are enveloped within his *Brady* claim. *See* Pet. at 10; Pet'r Postconviction Appeal Br. at 6-8 (Doc. No. 14-4).

[7] *See DuBois v. State*, No. CF-2009-303A, Order of Summary Disposition at 3-4 (citing Okla. Stat. tit. 22, § 1086) (Stephens Cnty., Okla. Dist. Ct. Oct. 30, 2012).

state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* at 729-30.

The OCCA's dismissal of these claims on postconviction appeal was based on both an independent and an adequate state procedural ground. The OCCA's imposition of a procedural bar was an "independent" state ground because it was "separate and distinct from federal law" and "the exclusive basis for the state court's holding." *See Maes v. Thomas*, 46 F.3d 979, 985 (10th Cir. 1995); OCCA Postconviction Order at 2.[8] "A state court finding of procedural default is adequate if it is strictly or regularly followed." *Maes*, 46 F.3d at 986 (internal quotation marks omitted). The Tenth Circuit has recognized that Oklahoma's bar on raising claims for postconviction relief that could have been raised on direct appeal is an independent and adequate state bar. *See Smith v. Workman*, 550 F.3d 1258, 1267 (10th Cir. 2008); *Hale v. Gibson*, 227 F.3d 1298, 1330 (10th Cir. 2000). As a result, federal habeas corpus review of Petitioner's Grounds 3 and 4 is precluded absent a showing by Petitioner of either: (1) cause for the default and actual prejudice, or (2) that a fundamental miscarriage of justice will result if Petitioner's claims are not considered. *See Coleman*, 501 U.S. at 750; *Hale*, 227 F.3d at 1330.

---

[8] Title 22, Section 1086 of the Oklahoma Statutes provides:

> All grounds for relief available to an applicant under [the Uniform Post-Conviction Procedure Act] must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior application.

"Cause" under the cause-and-prejudice analysis "must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 752. As outlined below, Petitioner argues ineffective assistance of appellate counsel (Grounds 8-11) as cause for his failure to raise Grounds 3 and 4 on direct appeal. *See infra* Part III(E). Attorney error amounting to constitutionally ineffective assistance of counsel under the Sixth Amendment may constitute cause as would be required to excuse a procedural default. *Coleman*, 501 U.S. at 753-54; *see also United States v. Lee Vang Lor*, 706 F.3d 1252, 1258 (10th Cir. 2013) (noting that ineffective assistance of counsel also may deny a defendant a full and fair opportunity to litigate, precluding application of the general restriction on habeas corpus review of search-and-seizure violations prescribed by *Stone v. Powell*, 428 U.S. 465 (1976)). Petitioner additionally argues that the State's failure to disclose the dash-cam video itself is cause to excuse his failure to raise these issues on direct appeal. Pet'r Br. at 3, 11. In certain circumstances, the failure of the State to disclose *Brady* material can constitute cause to excuse a petitioner's procedural default because the State's concealment is an "objective factor external to the defense" that impedes "efforts to comply with the State's procedural rule." *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Cannon v. Gibson*, 259 F.3d 1253, 1269 (10th Cir. 2001).

In Parts III(D) and (E) below, the undersigned undertakes review of the merits of Petitioner's underlying claims of Fourth Amendment and *Brady* violations in the context of his ineffective assistance of counsel claims. "Because the same legal standards govern petitioner's underlying claim of ineffective assistance of counsel and his closely related

burden to show cause for his state law procedural default, [the Court] must determine whether petitioner has shown cause concurrently with the merits of his ineffective assistance of counsel claim." *Hickman v. Spears*, 160 F.3d 1269, 1273 (10th Cir. 1998). As set forth in Part III(E), the undersigned concludes and recommends that Petitioner is not entitled to habeas relief on his ineffective assistance of appellate counsel claim. Thus, Petitioner cannot show that ineffective appellate counsel was cause for the failure to raise Grounds 3 and 4 on direct appeal. In addition, as discussed below in Parts III(D) and (E), Petitioner's underlying Fourth Amendment and *Brady* claims are not meritorious, and thus the State's alleged *Brady* violation does not serve as cause for Petitioner's failure to raise these claims.[9] Absent a showing of cause, there is no need for the Court to consider the existence of actual prejudice. *See Steele v. Young*, 11 F.3d 1518, 1522 n.7 (10th Cir. 1993).

As Petitioner cannot show cause and prejudice to excuse his procedural default, he must show that a fundamental miscarriage of justice will result absent consideration of his claims. *See Coleman*, 501 U.S. at 750; *Steele*, 11 F.3d at 1522. The fundamental miscarriage of justice exception is "extremely narrow," "implicated only in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Ballinger v. Kerby*, 3 F.3d 1371, 1375 (10th Cir. 1993) (internal quotation marks omitted). To prevail, Petitioner must identify evidence that "affirmatively demonstrate[s] his innocence." *See id.*; *Steele*, 11 F.3d at

---

[9] In other words, Petitioner would not be entitled to federal habeas relief on the merits of Grounds 3 and 4 even absent the procedural bar.

1522 (noting that a petitioner must supplement his constitutional claim with "a colorable showing of factual innocence").

Petitioner argues in Grounds 3 and 4 that the evidence of the mobile methamphetamine lab taken from his car should have been excluded as unlawfully obtained and the prosecution should have disclosed a video possibly showing his initial detention, but he does not argue that relief on Ground 3 or 4 would demonstrate his actual innocence of the charge of Endeavoring to Manufacture Methamphetamine. Nor would the record support such a claim. Accordingly, Petitioner's state-court procedural default of Grounds 3 and 4 precludes habeas review thereof. Petitioner is not entitled to federal habeas relief on these claims.

### D. Grounds 5, 6, and 7: Ineffective Assistance of Trial Counsel

In Ground 5, Petitioner asserts that his trial counsel was ineffective for failing to investigate and discover the dash-cam video. Petitioner relatedly asserts, in Ground 6, ineffective assistance of trial counsel for failing to move to suppress the evidence obtained in the search of Petitioner's vehicle. For Ground 7, Petitioner argues that his trial counsel was ineffective because he failed to challenge the trial court's use of a previous Tulsa County criminal conviction to enhance Petitioner's sentence for the Stephens County conviction.

Petitioner raised these claims in his application for postconviction relief and was denied relief by the trial court.[10] Petitioner then appealed this denial to the OCCA,

---

[10] *See DuBois v. State*, No. CF-2009-303A, Order of Summary Disposition at 2-4, 6 (Stephens Cnty., Okla. Dist. Ct. Oct. 30, 2012).

additionally requesting that he be granted an evidentiary hearing and discovery order. *See* Pet'r Postconviction Appeal Br. at 1-5, 9-14. The OCCA ruled that these claims were procedurally defaulted due to Petitioner's failure to raise them on direct appeal and also denied a hearing and order of discovery.[11] OCCA Postconviction Order at 2-3, 4 ("Any allegations as to trial counsel's ineffectiveness have been waived." (citing *Castro v. State*, 880 P.2d 387 (Okla. Crim. App. 1994))).

Respondent argues that, as with Grounds 3 and 4, Petitioner is precluded from obtaining habeas relief on Grounds 5, 6, and 7, owing to the OCCA's finding them procedurally barred. *See* Resp. at 28-31. When the underlying claim is ineffective assistance of trial counsel, however, the Tenth Circuit has recognized that countervailing concerns justify an exception to the general rule of procedural default. The state court's

---

[11] The undersigned takes note of the Tenth Circuit's recent decision in *Lott v. Trammell*, in which the court determined that "any denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11 . . . operates as an adjudication on the merits of the *Strickland* [ineffective assistance of counsel] claim and is therefore entitled to deference under [28 U.S.C.] § 2254(d)(1)." *See Lott*, 705 F.3d 1167, 1213 (10th Cir. 2013) (referencing Okla. Stat. tit. 22, ch. 18, app., R. 3.11(B)(3)(b) ("OCCA Rule 3.11")); *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner's postconviction appeal brief requested a hearing pursuant to OCCA Rule 5.2(C)(7), which states that OCCA Rule 3.11 is applicable to any request to supplement the record in an appeal of a denial of postconviction relief. *See* Pet'r Postconviction Appeal Br. at 14; Okla. Stat. tit. 22, ch. 18, app., R. 5.2(C)(7). Thus, pursuant to *Lott*, the OCCA's one-sentence denial of an evidentiary hearing constitutes an adjudication on the merits and is entitled to deferential review by this Court. Subjected to deferential review, the OCCA's resolution of Petitioner's hearing request on his ineffective assistance claims was not an unreasonable application of, or contrary to, *Strickland*. As outlined in Parts III(D) and (E), the underlying claims for Petitioner's contentions of ineffective assistance of trial counsel lack merit even under non-deferential review. Further, the OCCA's resolution of Petitioner's claims of ineffective appellate assistance is subject to deferential review, and does not warrant habeas relief, under § 2254(d)(1), even absent the OCCA's accompanying denial of an evidentiary hearing. *See infra* Part III(E).

procedural bar applies to ineffective assistance of counsel claims not raised on direct appeal only if certain conditions are met:

> [T]he Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone.

*English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998); *see also Spears v. Mullin*, 343 F.3d 1215, 1252 (10th Cir. 2003) (clarifying that for the second condition to be met, "either the defendant's ineffective-trial-counsel claim could be resolved solely on the trial record before the direct-appeal court or the defendant could have expanded the direct-appeal record to present his ineffective-assistance claim adequately").

In this case, Petitioner was represented by a different attorney on appeal than at trial, so the first requirement of *English* is satisfied. *See* Trial Tr. 1; Pet'r Direct Appeal Br. at 1 (Doc. No. 14-1); *English*, 146 F.3d at 1264. The undersigned will consider, respectively, whether the second *English* requirement is met for Ground 7 and then for Grounds 5 and 6.

### 1. *Ground 7*

The second *English* requirement is satisfied with respect to Ground 7, as this claim can be resolved solely on the basis of the trial court record that was before the OCCA. *See English*, 146 F.3d at 1264. Because both *English* requirements are satisfied, the procedural bar applies, and federal habeas review is precluded absent a showing by Petitioner of cause for the default and actual prejudice, or that a fundamental miscarriage of justice will result if Petitioner's claim is not considered. *See Spears*, 343 F.3d at 1252.

At sentencing, the trial court found that Petitioner had two or more prior felony convictions and therefore enhanced Petitioner's sentence in accordance with Title 21, Section 51.1 of the Oklahoma Statutes. Sent'g Tr. 208; OR 73 (J. and Sentence of Oct. 20, 2010). Petitioner argues that his trial counsel was ineffective for failing to challenge the admission and use of a certain Tulsa County District Court drug possession conviction,[12] in which Petitioner contends his guilty plea was unconstitutionally entered because Petitioner was not adequately advised of the necessary steps to appeal. Pet. at 13; Pet'r Br. at 18-22. Petitioner's trial counsel did, in fact, object at trial to the State's presentation of evidence as to the Tulsa County conviction and to the validity of that conviction. Trial Tr. 176. Petitioner's claim that his counsel improperly failed to object therefore could be resolved solely on the trial court record that was before the OCCA on Petitioner's direct appeal.

The trial court properly overruled Petitioner's objection to use of the prior conviction because, under Oklahoma law, Petitioner was not permitted to collaterally attack his previous conviction through objections raised at these later, unrelated criminal proceedings. *See* Trial Tr. 172, 176-77; State's Ex. 35 (Trial Tr. 247); *see also* Sent'g Tr. 197-98; *Martin v. State*, 674 P.2d 37, 41 (Okla. Crim. App. 1983). As a result, and as discussed further in Part III(E), the decision of Petitioner's appellate counsel not to directly appeal this issue may not be said to be ineffective assistance of appellate counsel such as would constitute cause to excuse application of the procedural bar. *See Cargle v.*

---

[12] *See State v. DuBois*, No. CF-1998-5470 (Tulsa Cnty., Okla. Dist. Ct.). The publicly available docket on www.oscn.net confirms that Petitioner filed no appeal or application for postconviction relief after his guilty plea was entered in the Tulsa County case.

*Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). Nor would Petitioner's success upon

Ground 7 demonstrate his actual innocence of the conviction at issue. *See Ballinger*, 3

F.3d at 1375. Because Petitioner cannot show cause and prejudice or that a fundamental

miscarriage of justice will result absent consideration of Ground 7, Oklahoma's

procedural bar applies to preclude habeas relief on this claim.[13]

---

[13] To the extent Petitioner now attempts to attack his prior conviction directly, he may not do so through a federal habeas action under 28 U.S.C. § 2254. "[O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid." *Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 403 (2001). When that conviction is later used to enhance a sentence, "the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained." *Id.* at 403-04.

An exception to this rule exists where "there was a failure to appoint counsel in violation of the Sixth Amendment." *Id.* at 404. Petitioner, however, was represented by counsel in the Tulsa County criminal proceeding. *See* State's Ex. 35. Thus, this exception is inapplicable. Another exception exists when a petitioner "can[not] be faulted for failing to obtain timely review of a constitutional claim," such as instances in which the petitioner obtains previously undiscoverable "compelling evidence that he is actually innocent" after the time for direct and collateral review has expired. *See Coss*, 532 U.S. at 405-06. Petitioner's contention that he cannot be faulted for failing to directly appeal his prior conviction because, although he was advised he had a right to appeal, he was not given adequate information by his attorney or the trial court concerning this right and how to proceed if he wished to appeal, is an attempt to come within the second exception. *See* Pet. at 13; Pet'r Br. at 19. The Tenth Circuit has rejected an identical argument by a habeas petitioner, reasoning that neither a criminal defense attorney nor a sentencing court is required, following a guilty plea, to inform a defendant of the right to appeal. *Carthen v. Workman*, 121 F. App'x 344, 347 (10th Cir. 2005) (further noting that the sentencing court has no duty "to contact defendants after sentencing to offer legal advice regarding the desirability of or proper procedures for an appeal").

Because Petitioner's Tulsa County conviction is conclusively valid pursuant to *Coss* and *Carthen*, Petitioner cannot challenge his enhanced sentence in this habeas proceeding based on the allegedly unconstitutional prior felony conviction.

## 2. *Grounds 5 and 6*

Resolution of Petitioner's contentions in Grounds 5 and 6—that his trial counsel was ineffective for failing to investigate and discover the dash-cam video and for failing to seek suppression of the evidence from Petitioner's vehicle—requires consideration of circumstances outside of the trial record that was before the OCCA on direct appeal. Thus, the second *English* requirement for giving preclusive effect to Oklahoma's procedural bar is not met with respect to these claims. In such an event, for the claims to be procedurally barred, the Court must determine that "Oklahoma's special appellate remand rule for ineffectiveness claims"—i.e., OCCA Rule 3.11, which provides a procedure for the OCCA to remand a matter to the trial court for an evidentiary hearing on ineffective assistance of counsel claims—is "adequately and evenhandedly applied." *See English*, 146 F.3d at 1264.

Petitioner contends that Oklahoma's procedures were inadequate because they did not allow him to expand the record to support his ineffective assistance of trial counsel claims. *See* Pet'r Br. at 2-3, 14-15; *Snow v. Sirmons*, 474 F.3d 693, 726 n.35 (10th Cir. 2007); *Spears*, 343 F.3d at 1252.[14] While "the State bears the ultimate burden of proving that its procedural mechanism was adequate, the habeas petitioner must also allege with specificity why the state procedural rules were inadequate to have permitted him to raise the omitted claim on direct appeal." *Spears*, 343 F.3d at 1252.

---

[14] As explained in more detail in Part III(E), *infra*, the record indicates that Petitioner did not have confirmation (through his appellate counsel) that a dash-cam video existed and was in the State's possession until after his direct appeal brief was filed.

In this case, however, the complicated procedural default issue need not be resolved because Petitioner's ineffective assistance of trial counsel claims may, and should, be denied on their merits. *See Snow*, 474 F.3d at 726; *Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2004) ("When questions of procedural bar are problematic, . . . and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits."). Moreover, because Petitioner bases his claims of ineffective assistance of *appellate* counsel on a failure to assert the alleged ineffective assistance of *trial* counsel, the merits of the claims should be addressed regardless of any procedural default in the state courts. *See Snow*, 474 F.3d at 726-27.

Claims of ineffective assistance of counsel in violation of the Sixth Amendment are analyzed under the familiar, two-part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668. "First, [Petitioner] must show that counsel's performance was deficient." *See id.* at 687. To satisfy this prong, Petitioner must show that his attorney's performance "fell below an objective standard of reasonableness," or, in other words, that counsel's performance was not "within the range of competence demanded of attorneys in criminal cases." *See id.* at 687-88. There is a strong presumption that counsel acted reasonably, and counsel's performance will not be deemed deficient if it "might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

With respect to the second prong of the analysis, Petitioner must show that *but for* counsel's unprofessional errors, there is a reasonable probability that the result of the

proceeding would have been different.  *See id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."  *Id.* at 695.

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.  Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different.  This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case.  The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 131 S. Ct. 770, 791-92 (2011) (citations and internal quotation marks omitted).

Petitioner's interrelated Grounds 5 and 6 rest on the same underlying premise: that the dash-cam video and accompanying audio recordings would prove that his right rear brake lamp was working and that, therefore, the initial traffic stop was unlawful.  Pet. at 11-12; Pet'r Br. at 2-7, 13-17.  Therefore, according to Petitioner, his trial counsel's failure to investigate and move for suppression of evidence from the search of the Ford Focus amounted to ineffective assistance of counsel under *Strickland*.  Pet. at 10-12, 14-15; Pet'r Br. at 2-7, 13-17.

The legality of a traffic stop under the Fourth Amendment is assessed pursuant to the framework of *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011).  The Court first determines "whether the traffic stop was justified at its inception.  Second, if the stop was justified, [the Court] determine[s] whether the

resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place." *Id.* (citation and internal quotation marks omitted). With respect to the first step, the Tenth Circuit recently explained:

> The Fourth Amendment requires that a traffic stop be "objectively justified" at its inception. That means a traffic stop must be based on an observed traffic violation or a police officer's reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. Although an officer's mistake of fact can still justify a probable cause or reasonable suspicion determination for a traffic stop, an officer's mistake of law cannot.

*United States v. Nicholson*, 721 F.3d 1236, 1238 (10th Cir. 2013) (citations and internal quotation marks omitted). In applying these standards, the Court "defer[s] to the reasonable inferences of law enforcement officers." *See United States v. Harmon*, 742 F.3d 451, 456 (10th Cir. 2014).

The Tenth Circuit has consistently held that an officer's mistake of fact may justify a probable cause or reasonable suspicion determination for a traffic stop. *United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005); *see also Nicholson*, 721 F.3d at 1238. "A traffic stop based on an officer's incorrect but reasonable assessment of the facts does not violate the Fourth Amendment." *Tibbetts*, 396 F.3d at 1138 (internal quotation marks omitted). More specifically, both the Tenth Circuit and the Oklahoma Court of Criminal Appeals have upheld the lawfulness of an initial traffic stop under the Fourth Amendment based on an officer's temporary belief that a traffic or equipment violation is occurring—even when the officer discovers the belief is mistaken during the course of the stop, including as the car was stopping or as the officer is approaching the car on foot. *See United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (accepting

lawfulness of *initial* traffic stop where officer mistakenly believed temporary registration sticker was invalid); *McGaughey v. State*, 37 P.3d 130, 135 (Okla. Crim. App. 2001) (holding *initial* traffic stop was lawful where officer mistakenly believed that vehicle's tail lamps were not working). Both courts, however, hold that when the reasonable suspicion that justified the initial traffic stop is completely dispelled—that is, when the purpose of the traffic stop is fulfilled because the officer realizes he or she was mistaken—any further detention or investigation on that basis would violate the Fourth Amendment. *See McSwain*, 29 F.3d at 561 ("Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied. Trooper Avery's further detention of the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification."); *McGaughey*, 37 P.3d at 140 ("[A]n officer who realizes that his stop of a vehicle was mistaken—and who has no other cause for reasonable suspicion of the driver—has no authority to further detain the driver or his vehicle.").

An officer in these circumstances is permitted to explain to the passengers in the stopped vehicle "the reason for the initial detention and then allow them to continue on their way without asking them to produce their driver's license and registration." *McSwain*, 29 F.3d at 562. It is possible that during this limited exchange the officer may observe facts that would independently justify a new detention or search. "[W]e do not discount the possibility . . . that the brief encounter between an officer and driver authorized by *McSwain* might independently give rise to facts creating reasonable

suspicion of criminal activity, thus warranting further investigation." *United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006);[15] *see also McGaughey*, 37 P.3d at 140-41 ("The seizure becomes illegal at the point where its initial justification has ceased *and no new justification has arisen*." (emphasis added)).

Applying this law to the facts of Petitioner's case, it becomes clear that Petitioner was not prejudiced by his trial counsel's failure to seek, and move for suppression of evidence based on, the dash-cam video. This is true even if it is assumed that Petitioner is correct that the dash-cam video would show that both of his brake lamps were operable and displayed a visible light.

First, the stop of the Ford Focus was justified at the outset by the troopers' reasonable articulable suspicion of the commission of an equipment violation. Title 47, Section 12-206 of the Oklahoma Statutes mandates that "[e]very vehicle . . . shall be equipped with at least two stop lamps" "mounted on the rear of the vehicle at the same level, as far apart as practicable," which "[s]hall display a red or amber light . . . visible from a distance of not less than five hundred (500) feet to the rear in normal sunlight" and which "[s]hall be actuated upon application of the brakes." *See also* Okla. Stat. tit. 47, §§ 12-101, 17-101 (classifying equipment violation as misdemeanor). As noted above, both Trooper Carmen and Lieutenant Peck testified that the right rear brake lamp (or "stop lamp") on the Ford Focus was not working or that the light from that brake

---

[15] In *Edgerton*, the Tenth Circuit did not decide this issue as part of its holding because "the district court . . . made no finding . . . that the facts which [the officer] observed independently gave rise to reasonable suspicion and the Government makes no such argument on appeal." *See Edgerton*, 438 F.3d at 1051.

lamp was not clearly visible from the rear of the car. Trial Tr. 23-24, 41, 48. Petitioner

argues that the dash-cam video would have shown that both brake lamps were

operational. However, a video showing that both brake lamps functioned at a particular

moment during the stop would not speak to the troopers' observations at a prior moment

or from a different angle.[16] Trooper Carmen testified that the video camera was

programmed to begin to record when the patrol car's emergency lights were turned on, an

event that happened after Lieutenant Peck's and his initial observations of the brake

lamps. Trial Tr. 41, 23-24. Even assuming that the dash-cam video would show that the

brake lamps were operational, Trooper Carmen's decision to stop the Ford Focus was

---

[16] Courts have denied suppression and found that officers had a reasonable articulable suspicion for a traffic stop despite any clear evidence of the driver's purported traffic violation on footage from a dash-cam video. In *United States v. Harmon*, the Tenth Circuit held that an officer had sufficient reasonable articulable suspicion to stop a car when the officer testified that he had seen the car weaving and crossing the fog line. 742 F.3d at 458 (reviewing for clear error and accepting officer's testimony as factual). In affirming the denial of a motion to suppress on direct appeal, the court expressly noted that the officer's dash-cam video, "captur[ing] one minute preceding the stop and all events following," failed to record the offenses that the officer saw. *See id.* at 454. The Eighth Circuit likewise has indicated that the absence of a traffic violation on dash-cam video footage is not conclusive as to whether law enforcement officers had reasonable suspicion of a traffic violation. *See United States v. Frasier*, 632 F.3d 450, 452-54 (8th Cir. 2011) (affirming denial of motion to suppress because, *inter alia*, lack of erratic driving seen on dash-cam recording did not contradict officer's earlier observation "but rather show[ed] that [defendant] did not continue to drive in a careless and imprudent manner"); *cf. United States v. Bassols*, 775 F. Supp. 2d 1293, 1296 (D.N.M. 2011) (denying suppression when dash-cam video did not "conclusively show" whether vehicle crossed stripe dividing driving lane from shoulder); *United States v. Wiley*, No. 10-61-JJB-SCR, 2011 WL 1743650, at *3 (M.D. La. May 6, 2011) (denying suppression when dash-cam video "arguably" showed defendant rolling through stop sign); *United States v. Roach*, No. 08-0104-01-CR-W-ODS, 2008 WL 4488287, at *5 n.3 (W.D. Mo. Oct. 6, 2008) ("The fact that defendant's failure to signal was not caught on tape does not signify that it did not happen given that the dash-cam is located on the right side of the rearview mirror and [the officer] had to sit as far to the left in his seat as he could to see around the van parked in front of him.").

objectively justifiable in light of Lieutenant Peck's and his perception that the car was being operated in violation of Oklahoma law.

Petitioner also argues that the troopers' account of the nonworking or deficient brake lamp was a "pretextual" basis for the initial stop and that the troopers' true motivation for the stop was not the nonworking brake lamp. Pet'r Br. at 5. Other than the dash-cam video, Petitioner points to no evidence in the record to support his theory that the troopers had another reason to stop his car. *See, e.g.*, *Polly*, 630 F.3d at 994 (noting that officer suspected the driver of involvement in drug distribution); *Harmon*, 742 F.3d at 455 (noting that officer's traffic stop was motivated by a tip from the DEA). At trial, Petitioner's counsel had and took the opportunity to cross-examine the troopers as to their justification for stopping Petitioner. *See* Trial Tr. 41, 60-61. For the reasons outlined above, the dash-cam video, standing alone, would not have disproved or refuted entirely the troopers' testimony supporting their contention that they had a reasonable articulable suspicion that an equipment violation was occurring. Similarly, that the troopers may have had a motive additional to verifying the equipment violation would not "invalidate[] objectively justifiable behavior under the Fourth Amendment." *Whren v. United States*, 517 U.S. 806, 812 (1996). The law is well established that the subjective intentions and motivations of the officers are not relevant to the probable cause/reasonable articulable suspicion analysis. *See id.* at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Polly*, 630 F.3d at 997 (noting whether officer's traffic stop was "simply a ruse" is "legally irrelevant" to Fourth Amendment analysis).

Second—even if it is assumed that the dash-cam video would show that the officers should have realized, during the course of stopping the Ford Focus, that the perception of a faulty right brake lamp was incorrect—Trooper Carmen's observations during the termination of the initial traffic stop independently gave the troopers reasonable suspicion of criminal activity sufficient to detain Petitioner and Ms. Kincaid and probable cause to search the car. Upon realizing that the brake lamps on the Ford Focus were operational, the troopers generally would have been required to cease any detention or investigation arising from the initial purpose of the stop. *See McSwain*, 29 F.3d at 561-62 (holding that once officer's reasonable suspicion is dispelled, purpose of stop is satisfied and further detention is prohibited under Fourth Amendment). The troopers would have been permitted, however, to approach the car to advise Petitioner and Ms. Kincaid of what happened and that they were free to leave. *See id.*

The testimony of Trooper Carmen shows that, immediately upon stopping the Ford Focus and while approaching to speak to the occupants, he observed facts that independently justified the detention and search of the car. Specifically, Trooper Carmen observed that there was a strong odor of ether coming from the car (Trial Tr. 25-26); the car's windows were down despite "chilly" weather (Trial Tr. 24, 26); a bottle of Coleman Fuel, which could be associated with the manufacture of methamphetamine, was in the back seat of the car (Trial Tr. 26-27); and a metal device, identified by Lieutenant Peck as of a kind used to obtain anhydrous ammonia, was in the front of the car (Trial Tr. 33-34). Trooper Carmen testified that his experience and observations led him to believe that

methamphetamine was being or had been manufactured inside the vehicle. *See* Trial Tr. 28, 30.

An officer is not required to end his initial traffic stop if he "obtains 'a new and independent basis' for suspecting the detained individual of criminal activity." *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009) (citation omitted); *see also Edgerton*, 438 F.3d at 1051. Questioning unrelated to a traffic stop is permissible during a traffic stop if the officer has "an objectively reasonable and articulable suspicion [that] illegal activity has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). Law enforcement officers are not required to turn a blind eye to an aggregate of circumstances that, in their training and experience, presents the likelihood or significant possibility of illegal activity. *See id.*; *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997). Rather, officers may take such reasonable investigative steps as necessary to confirm or dispel their suspicions, and the subjects may be detained while these steps are being taken. *United States v. Martinez*, 983 F.2d 968, 974 (10th Cir. 1992). Here, Trooper Carmen's observations during the short time period of his initial approach to speak to the occupants of the Ford Focus would have provided him an objectively reasonable and articulable suspicion that the illegal manufacture of methamphetamine was occurring in the car.[17] Accordingly, from that point forward he

---

[17] In analyzing whether facts were observed during the termination of the initial, allegedly mistaken traffic stop that independently would justify detention of the car's occupants, the observations by Lieutenant Peck arguably are immaterial because his presence would not have been required to accomplish the limited purpose of advising the occupants of the car that they may continue on their way. In any event, Lieutenant Peck's observations merely confirm and support Trooper Carmen's observations and

would have been justified—independently of the initial traffic stop—in detaining and questioning the occupants.

The subsequent warrantless search of the Ford Focus was justified both by the consent of the owner and by probable cause. The troopers testified that Ms. Kincaid, the car's owner, provided verbal consent for the car to be searched. *See* Trial Tr. 28-29, 50. Regardless, an odor associated with drugs emanating from a vehicle can provide probable cause to search the vehicle after a lawful traffic stop. *See United States v. Loucks*, 806 F.2d 208, 209-10 & n.1 (10th Cir. 1986) (noting when trained officer detects odor of marijuana coming from car's interior, subsequent search of passenger compartment is based on probable cause); *United States v. Lopez*, 777 F.2d 543, 551 (10th Cir. 1985) (holding experienced officer's smell of substance coming from vehicle, which he associated with transport of "bulk cocaine," furnished probable cause to search vehicle). Here, the strong odor of ether emanating from the Ford Focus, along with the presence of equipment associated with the manufacture of methamphetamine that was plainly visible in the passenger compartment of the car, gave rise to probable cause sufficient to support a warrantless search of the car. *See Loucks*, 806 F.2d at 209-10 & n.1; *Lopez*, 777 F.2d at 551; *Hunnicutt*, 135 F.3d at 1349.

As a result, even assuming the dash-cam video shows what Petitioner would like it to show, Petitioner has failed to demonstrate an underlying violation of his Fourth Amendment rights that would have supported the exclusion of evidence obtained from

---

testimony, which, standing alone, are sufficient to establish reasonable suspicion of illegal activity justifying further detention of Petitioner and his passenger.

the vehicle. Therefore, Petitioner cannot demonstrate the requisite prejudice to support his ineffective assistance of trial counsel claim and is not entitled to habeas relief on Grounds 5 or 6. Because Petitioner has failed to demonstrate that he was prejudiced by his trial counsel's performance, the undersigned need not address whether counsel's performance was deficient with regard to his investigation or suppression efforts. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### E. Grounds 8-11: Ineffective Assistance of Appellate Counsel

Finally, Petitioner alleges his appellate counsel was ineffective for failing to raise certain issues on direct appeal: the alleged *Brady* violation (Ground 8); trial counsel's ineffectiveness for failing to seek suppression of the evidence from the search of Petitioner's vehicle (Ground 9); trial counsel's ineffectiveness for failing to challenge the use of Petitioner's previous conviction for sentence enhancement (Ground 10); and trial counsel's ineffectiveness for failing to investigate available evidence (i.e., the dash-cam video) to impeach the State's witnesses at trial (Ground 11). Pet. at 14-17; Pet'r Br. at 2-22. In connection with Ground 11, Petitioner additionally asserts that his appellate counsel improperly failed to seek an evidentiary hearing as part of the direct appeal. Pet. at 17; Pet'r Br. at 13-17.

Petitioner raised these claims to the OCCA on his appeal of the denial of postconviction relief. *See* Pet'r Postconviction Appeal Br. at 2-14. In affirming, the OCCA grounded its decision upon *Strickland*'s "prejudice" prong and stated:

Petitioner also claims that he was denied effective assistance of appellate counsel. Claims of ineffective assistance of appellate counsel may be raised for the first time on post-conviction as it is usually a petitioner's first opportunity to allege and argue the issue. As set forth in *Logan v. State*, 2013 OK CR 2, ¶ 5, __ P.3d __, post-conviction claims of ineffective assistance of appellate counsel are reviewed under the standard for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See Smith v. Robbins*, 528 U.S. 259, 289, 120 S. Ct. 746, 765, 145 L. Ed. 2d 756 (2000) ("[Petitioner] must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of appellate counsel."). Under *Strickland*, a petitioner must show both (1) deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-89, 104 S. Ct. at 2064-66. And we recognize that "[a] court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011) (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

We set forth in *Logan* that in reviewing a claim of ineffective assistance of appellate counsel under *Strickland*, a court must look to the merits of the issues appellate counsel failed to raise. Only an examination of the merits of any omitted issues will reveal whether appellate counsel's performance was deficient and also whether the failure to raise the omitted issue on appeal prejudiced the defendant; i.e., whether there is a reasonable probability that raising the omitted issue would have resulted in a different outcome in the defendant's direct appeal.

In the present case the trial judge found Petitioner was unable to show any prejudice from appellate counsel's failure to raise these claims. We agree. Judge Enos found that appellate counsel advised Petitioner in extensive correspondence that the appeal record did not support Petitioner's assertions of ineffective assistance of trial counsel, discovery shortcomings or claims of prosecutorial misconduct of suppression of exculpatory evidence. Further, the record does not support Petitioner's contention that the District Court erred in denying his postconviction application without an evidentiary hearing. An evidentiary hearing is only required when there exists a genuine issue of material fact. *See* Sections 1083-1084 of Title 22.

As Petitioner has failed to show entitlement to relief in a post-conviction proceeding, the order of the District Court of Stephens County denying Petitioner's application for post-conviction relief is **AFFIRMED**.

Petitioner's motion for an evidentiary hearing and order of discovery is
**DENIED**.

OCCA Postconviction Order at 3-4 (alterations in original).

Because the OCCA adjudicated Petitioner's ineffective assistance of appellate counsel claims on the merits, habeas relief may be awarded only if Petitioner demonstrates that the OCCA's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d); *Dodd*, __ F.3d __, 2013 WL 7753714, at *6. Thus, federal courts reviewing habeas claims that have previously been resolved on the merits in state courts must apply a "level of deference to the determinations of state courts, provided those determinations did not conflict with federal law or apply federal law in an unreasonable way." *Williams v. Taylor*, 529 U.S. 362, 386 (2000) (internal quotation marks omitted). Pursuant to AEDPA, factual findings made by a state trial or appellate court are presumptively correct and may be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The undersigned applies this standard to Plaintiff's separate grounds for relief in the following order: Grounds 9 and 11, Ground 10, and Ground 8.

1. *Grounds 9 and 11*

In Grounds 9 and 11, Petitioner challenges his appellate counsel's failure to raise a claim of ineffective assistance of trial counsel for (a) failing to seek suppression of the

evidence from Petitioner's car; (b) failing to investigate, discover, and use available evidence at trial (i.e., the dash-cam video) to impeach and rebut the testimony of the State's witnesses; and (c) failing to seek an evidentiary hearing under OCCA Rule 3.11. Pet. at 15, 17; Pet'r Br. at 2-7, 13-17. For Petitioner to establish he is entitled to habeas relief concerning his allegation of ineffective assistance of appellate counsel, Petitioner must satisfy both prongs of the test established in *Strickland*; that is, he must show that his attorney's representation fell below an objective standard of reasonableness and that these errors prejudiced the defense. *See Strickland*, 466 U.S. at 687. "[T]he Sixth Amendment does not require an attorney to raise every nonfrivolous issue on appeal." *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995). "It is completely reasonable, and in fact advisable, for appellate counsel to eliminate weak but arguable claims and pursue issues on appeal [that] are more likely to succeed." *Jackson v. Shanks*, 143 F.3d 1313, 1321 (10th Cir. 1998). If an issue that appellate counsel failed to raise has merit, the court must determine whether counsel's failure to raise the issue was deficient and prejudicial. *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999).

As outlined above in Part III(D)(2), Petitioner's underlying ineffective assistance of trial counsel claims are meritless. Petitioner has not shown that he was prejudiced by trial counsel's failure to seek suppression or to "discover" the video that was in the State's possession. It follows that appellate counsel's performance was not deficient or prejudicial in failing to raise these meritless claims on direct appeal. *See Jackson*, 143 F.3d at 1321. The OCCA's determination that there was no reasonable possibility that raising these issues would have resulted in a different outcome on appeal, including its

denial of an evidentiary hearing, was neither contrary to nor an unreasonable application of *Strickland*. *See* OCCA Postconviction Order at 3-4; 28 U.S.C. § 2254(d); OCCA Rule 3.11 (prescribing that OCCA must remand matter for evidentiary hearing on ineffective assistance of trial counsel allegation when shown "by clear and convincing evidence there is a strong possibility trial counsel was ineffective"). Habeas relief should be denied on Grounds 9 and 11.

### 2. *Ground 10*

In Ground 10, Petitioner challenges his appellate counsel's failure to raise a claim of ineffective assistance regarding trial counsel's lack of objection to the use of Petitioner's prior Tulsa County conviction for sentence enhancement. Pet. at 13; Pet'r Br. at 18-22. As stated above in Part III(D)(1), however, Petitioner's trial counsel in fact objected to the trial court's consideration of this prior conviction. The objection was overruled because under Oklahoma law Petitioner's opportunity to challenge the Tulsa County conviction lay in a direct appeal or through postconviction relief in that criminal proceeding, not by objecting at an unrelated criminal trial. *See* Trial Tr. 172, 176-77; State's Ex. 35 (Trial Tr. 247); *Martin*, 674 P.2d at 41; *see also* Sent'g Tr. 197-98. Therefore, the OCCA's determination that Petitioner's appellate counsel was not ineffective for omitting this ineffective-trial-counsel claim on direct appeal was neither unreasonable nor contrary to *Strickland*. Petitioner is not entitled to habeas relief on Ground 10.

### 3. *Ground 8*

Finally, Petitioner asserts that his appellate counsel was ineffective for failing to argue on direct appeal that the State violated *Brady v. Maryland* through its nondisclosure of the dash-cam video. Pet. at 14; Pet'r Br. at 8-12. Under *Brady*, the prosecution violates a defendant's due process rights when it fails to disclose evidence favorable to the defendant that was material either to guilt or punishment. 373 U.S. at 87. Therefore, to establish a *Brady* violation, Petitioner must show that: "(1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material." *Knighton v. Mullin*, 293 F.3d 1165, 1172 (10th Cir. 2002) (internal quotation marks omitted). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Moore v. Gibson*, 195 F.3d 1152, 1165 (10th Cir. 1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

### a. Suppression

"To establish a *Brady* violation, petitioner bears the burden of showing that the prosecution suppressed material evidence favorable to petitioner." *Id.* at 1164. The Constitution, as interpreted by the Supreme Court in *Brady*, "does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit

the defendant." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995).

The prosecution must only reveal information that it had in its possession or of which it

had actual or constructive knowledge. *Id.* at 824-25. Suppression may be either willful

or inadvertent. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The parties to the criminal trial were subject to a general discovery order, under

which the prosecuting attorney was required to disclose to defense counsel "any material

or information within the prosecutor's possession or control which tends to negate the

guilt of the accused as to the offense charged." OR 23 (citing *Brady*). The record

establishes that a dash-cam video was generated by the troopers who arrested Petitioner

on November 27, 2009, and that the video was not disclosed to Petitioner. Although

Respondent does not definitively acknowledge these facts in his brief, correspondence

between Petitioner and appellate counsel and between appellate counsel and the Legal

Division of the Oklahoma Department of Public Safety ("DPS"), which was before the

trial court and the OCCA during postconviction proceedings, establishes there was a

dash-cam video made that was still in existence as of June 22, 2011, and that Petitioner's

appellate counsel requested DPS to preserve for at least three years.[18] The troopers

testified at trial that it was possible a dash-cam video had been created. *See* Trial Tr. 41,

60-61. Petitioner and his counsel both appeared to be surprised at trial by the potential

existence of dash-cam video footage preceding the search of the car. *See* Trial Tr. 41;

Sent'g Tr. 213 (Petitioner stated "it was kind of a newly discovered deal during

---

[18] *See DuBois v. State*, No. CF-2009-303A, Petitioner's Application for Post-Conviction Relief (Stephens Cnty., Okla. Dist. Ct. July 13, 2012); OCCA Postconviction Order at 4 (referring to the correspondence).

questioning at trial . . . as to when . . . the camera came on.").  There is no evidence in the record that, prior to trial, the prosecuting attorney had actual knowledge that a dash-cam video existed.

The undersigned assumes without deciding that the State had constructive knowledge of the dash-cam video and therefore suppressed its existence within the meaning of *Brady*.  *See United States v. Smith*, 534 F.3d 1211, 1223 (10th Cir. 2008) ("[A] defendant may base a *Brady* claim on a piece of material evidence not disclosed by an investigator, even if the prosecutor did not know of the evidence.").  The Tenth Circuit has approved this approach, which avoids the need to determine whether knowledge should be imputed to the prosecution, when a *Brady* claim instead can be resolved on the issue of materiality.  *See United States v. Combs*, 267 F.3d 1167, 1175 (10th Cir. 2001).  The undersigned additionally will assume that *Brady*'s disclosure requirements would have applied during the motion to suppress stage prior to trial.  *See Lee Vang Lor*, 706 F.3d at 1256 n.2 (noting *Brady*'s applicability at this stage "is an open question").

### b.  Favorability

Petitioner's argument that the dash-cam video would have served as either exculpatory or impeachment evidence is entirely speculative.  In order for the video to substantiate Petitioner's underlying claim that both of his brake lamps were operable, thereby possibly providing a basis to suppress the evidence from Petitioner's car and/or to impeach the testimony of the state troopers, the video, at a minimum, must show clearly (i) both brake lamps, (ii) which both were illuminated, and (iii) at a point in time when both the lamps and their display were visible to the state troopers from where they

sat in Trooper Carmen's patrol car. Petitioner asserts that the video will show all of these things, but it is possible that the video would show none of them, depending on the quality of the video, its duration, its vantage point in the troopers' vehicle, and other unknowns. *See, e.g.*, *Bassols*, 775 F. Supp. 2d at 1296; *Roach*, No. 08-0104-01-CR-W-ODS, 2008 WL 4488287, at *5 n.3. Regardless, Trooper Carmen testified that the video camera was programmed to begin to record when the patrol car's emergency lights were turned on, an event that happened after the initial observations of the brake lamps. Trial Tr. 41, 23-24.

Further, while the dash-cam video arguably would have been relevant to a suppression attempt, the video would not have been "exculpatory" in the more usual sense of the word, as it would not speak to whether Petitioner actually committed the charged felony offense. *Cf. Lee Vang Lor*, 706 F.3d at 1256 n.2. Because assessment of the actual video is not possible here, the undersigned will assume solely for purposes of this *Brady* analysis that the dash-cam video in fact would have provided Petitioner with some manner of exculpatory or impeachment evidence at trial. *But see Wiley*, No. 10-61-JJB-SCR, 2011 WL 1743650, at *3 (denying suppression when dash-cam video only "arguably" showed traffic violation).

### c. Materiality

As noted above, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. The Court views the undisclosed

evidence in relation to the record as a whole, as the materiality of exculpatory evidence will vary with the overall strength of the government's case. *See Smith*, 50 F.3d at 827. The Court's materiality review "does not include speculation. The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *Banks*, 54 F.3d at 1519 (internal quotation marks omitted). The Supreme Court has "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes." *Kyles*, 514 U.S. at 433.

The dash-cam video plainly is not material in and of itself, but only to the extent it would support the exclusion of other evidence or serve to impeach the testimony of the troopers. That is, if the evidence obtained from the search of the Ford Focus (e.g., laboratory equipment, chemicals and other items used in the manufacture of methamphetamine, and actual methamphetamine and other controlled substances) is considered, there is clear factual support for the verdict that Petitioner was engaged in the manufacture of methamphetamine. That conclusion would not be undermined by a dash-cam video that showed two operational brake lamps. *See Kyles*, 514 U.S. at 435 (stating undisclosed evidence is material only if it, considering "the overall strength of the government's case," could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

Insofar as the exculpatory nature of the dash-cam video, for the reasons outlined above in Parts III(C) and (D), Petitioner has not shown a "reasonable probability" that disclosure of the dash-cam video, standing alone, would have resulted in exclusion of the numerous items of evidence found in the car and on Petitioner's person. If the video

showed both brake lamps working during the time the video was running, this fact still would not, in and of itself, establish that the troopers' perception that one brake lamp was not working was unreasonably mistaken. Moreover, even if Petitioner could establish a Fourth Amendment violation, application of the exclusionary rule is a "last resort" and not automatically applied to Fourth Amendment violations. *See Herring v. United States*, 555 U.S. 135, 139-41 (2009). Because Petitioner is unable to show a reasonable probability that even a favorable dash-cam video would have led to exclusion of the government's evidence, confidence in the outcome of a trial in which that evidence was presented is not undermined. *See Bagley*, 473 U.S. at 682; *Kyles*, 514 U.S. at 435.

To the extent Petitioner contends the video was material as impeachment evidence, i.e. to undermine the state troopers' testimony at trial, its value is weak. Video showing that Petitioner's brake lamps were working at a particular time would not, by itself, automatically vitiate the troopers' reasonable articulable suspicion that one lamp was not working. The troopers were cross-examined by Petitioner's trial counsel as to the basis for initially stopping Petitioner even without the video being in the record. See Trial Tr. 41-42, 59-61. In *Harmon*, the Tenth Circuit affirmed the district court's determination that evidence showing (i) a traffic stop was motivated by a DEA tip, and (ii) the officer asked that the DEA tip be omitted from the dispatcher's report of the stop, "did not possess impeachment value and was unlikely to change the outcome of the suppression hearing." 742 F.3d at 460. Here, similarly, it is possible but not reasonably probable that Petitioner's ability to impeach the state troopers with the dash-cam video would have led to a different result in light of the record as a whole.

Accordingly, the dash-cam video is not material because Petitioner cannot establish there is a reasonable probability that, had the dash-cam video been disclosed to the defense, the result of his criminal proceeding would have been different. "[S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more." *Kyles*, 514 U.S. at 437.

### d. The OCCA's Determination

As noted above, the OCCA considered the merits of Petitioner's claim of ineffective assistance of appellate counsel with respect to the *Brady* issue, but the court denied relief because Petitioner was unable to show any prejudice from appellate counsel's failure to raise that issue. OCCA Postconviction Order at 4. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 131 S. Ct. at 785. "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* (noting state court must be granted "a deference and latitude" under 28 U.S.C. § 2254(d) that is not present on direct appeal of a *Strickland* claim). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (citations omitted).

The inquiries are "virtually identical" for the "materiality" element under *Brady* and the "prejudice" element under *Strickland*. *Snow*, 474 F.3d at 725 n.34. Because it has not been shown that the dash-cam video was "material" under *Brady*, it is not reasonably likely that appellate counsel's failure to raise this issue actually prejudiced

Petitioner's defense. *See id.*; *cf. Smith v. Robbins*, 528 U.S. 259, 278 (2000) (noting right to counsel on appeal "does not include the right to counsel for bringing a frivolous appeal"). The OCCA's determination that Petitioner was not prejudiced by his appellate counsel's failure to raise a *Brady* claim was not an "unreasonable application" of clearly established Supreme Court precedent. *See Snow*, 474 F.3d at 725 n.34 (noting that rejecting a *Brady* claim on materiality grounds would necessarily require rejection of the accompanying ineffective-assistance claim); *Hawkins*, 185 F.3d at 1152 ("If the omitted issue is meritless, then counsel's failure to raise it [on appeal] does not amount to constitutionally ineffective assistance.").

Where a state court reasonably could have determined that defense counsel acted on strategic decisions and performed competently, and the state court reasonably could have concluded that there was no substantial likelihood counsel's actions altered the outcome of the case, habeas relief is unavailable. *Harrington*, 131 S. Ct. at 791-92. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 792. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith*, 528 U.S. at 288 (internal quotation marks omitted). Here, in light of the lack of materiality of the dash-cam video, the OCCA reasonably could have determined that defense counsel made competent strategic decisions and that there was no substantial likelihood that contrary

decisions would have altered the outcome of the case. Ground 8 of the Petition should be denied.[19]

## IV.    Petitioner's Motions

In motions pending before the Court, Petitioner seeks an evidentiary hearing and requests that he be allowed to conduct discovery. *See* Doc. Nos. 5, 6. Both requests are focused upon Petitioner's desire to obtain and view the dash-cam video purportedly showing his traffic stop and arrest. In light of the undersigned's recommendation of denial of habeas relief on all grounds, even based on an assumption that the dash-cam video would show operational brake lamps, Petitioner's motions should be denied.

## RECOMMENDATION

As outlined above, it is recommended that the Petition for Writ of Habeas Corpus (Doc. No. 1) be denied. Upon adoption of this Report and Recommendation, Petitioner's pending motions (Doc. Nos. 5, 6) should be denied.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file an objection to the Report and Recommendation with the Clerk of this Court by the 17th day of May, 2014, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. The parties are further advised that failure to timely object to this Report and Recommendation waives

---

[19] The OCCA's implicit factual finding that "appellate counsel advised Petitioner in extensive correspondence that the appeal record did not support Petitioner's assertions of . . . claims of prosecutorial misconduct of suppression of exculpatory evidence" has not been rebutted by clear and convincing evidence. *See* OCCA Postconviction Order at 4; 28 U.S.C. § 2254(e)(1).

the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned in the present case.

The Clerk of the Court is directed to electronically forward a copy of this Report and Recommendation to the Attorney General for the State of Oklahoma on behalf of the Respondent at fhc.docket@oag.state.ok.us.

ENTERED this 25th day of April, 2014.

CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE